UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| **Kevin Uselman,** | **Civil No. 12-1226 (PJS/JJG)** |
| **Plaintiff,** | |
| v. | **REPORT AND RECOMMENDATION** |
| **John C. Pentland,** | |
| **Defendant.** | |

JEANNE J. GRAHAM, United States Magistrate Judge

This case is before the undersigned United States Magistrate Judge on Defendant's Motion to Dismiss and for Summary Judgment (ECF No. 30). Plaintiff Kevin M. Uselman ("Uselman") did not submit an opposition to the instant motion. As set forth below, the Court recommends that summary judgment be granted to Defendant John C. Pentland ("Pentland") and that the case be dismissed.

**I.   Background**

Uselman is a civilly committed detainee in the Minnesota Sex Offender Program (MSOP) in Moose Lake, Minnesota. Uselman has been detained in various facilities, including Minnesota Correctional Facility at Rush City ("MCF-Rush City"). During the pendency of this case, Uselman's conviction was reversed by the Minnesota Court of Appeals. *Uselman v. State*, 831 N.W.2d 690 (Minn. Ct. App. 2013). He was then discharged from Minnesota Department of Corrections (DOC) custody and returned to MSOP. (Hudson Aff. Ex. C, ECF No. 36-2.)

He brings the present action pursuant to 42 U.S.C. § 1983 against Pentland, a lieutenant employed by the DOC. Specifically, Uselman alleges that Pentland failed to protect him during his tenure at MCF-Rush City, a violation of the Eighth Amendment to the United States

Constitution. (Compl. ¶ 5, May 15, 2012, ECF No. 1.) Uselman is suing Pentland individually and in his official capacity. (Compl. ¶ 4.)

The present action centers on various incidents that Uselman alleges occurred during his time at MCF-Rush City. Uselman's complaints relate to Pentland's supervision of Complex One, which Pentland supervised at all times relevant to this matter. (Pentland Aff. ¶ 1, ECF No. 32.) When he supervised Complex One, Pentland did not direct the operations of any other unit. (*Id.*) Uselman lived in Complex One from June 15, 2010, to June 29, 2010; from July 15, 2010, to July 26, 2010; from September 16, 2010, to December 21, 2010; and from November 14, 2011, to June 28, 2012. (Pentland Aff. ¶ 7, Ex. A at 2-3.) For most of the allegations, it does not appear that Uselman is alleging that he was assaulted in Complex One, but instead that Pentland should have prevented Uselman from leaving segregation, thereby exposing Uselman to others who could hurt him. (*See, e.g.*, Compl. ¶¶ 12, 36.) By not doing so, Uselman contends, Pentland risked Uselman's life by "saying that [Uselman] has to be placed in population like all the other inmates." (*Id.* ¶ 36.)

### A.   Uselman's Allegations

The following facts are derived from Uselman's Complaint. In July 2010, Uselman was walking in the recreational yard when four inmates approached him. (*Id.* ¶ 19.) He does not know the names of the inmates but asserts they are members of a gang. (*Id.*) At that time, at least two, and potentially four, of the men pushed Uselman to the ground and proceeded to kick him in the back, stomach, and sides. (*Id.*) He was punched in the head numerous times. (*Id.*) Uselman estimates that the men attacked him for four minutes before being pulled off of him. (*Id.*) He avers that he did not seek medical attention because he "felt he could handle and manage the pain inflicted upon him." (*Id.* ¶ 29.)

One month later, in August 2010, Uselman was outside in the recreational yard when three inmates approached him. He does not know the names of these inmates, but believes they are members of a different gang than those who previously attacked him. (*Id.* ¶ 20.) The three men then proceeded to stab and punch Uselman and strike him with a baseball bat. (*Id.*) The stabbing punctured Uselman's forearm, back, and stomach. (*Id.*) The attack lasted a few minutes, until Uselman was left on the ground unconscious. (*Id.*) He again did not seek health services, believing he "could handle and manage the pain inflicted upon him." (*Id.* ¶ 29.)

The third incident occurred in September 2010. (*Id.* ¶ 26.) Before the incident, Uselman heard one unknown inmate say to another unknown inmate that he was "planning on trying to rape someone." (*Id.* ¶ 25.) Uselman reported the conversation to unknown front desk correctional officers. (*Id.*) One of the officers later told Uselman that the information had been relayed to Pentland, stating "everything should be all good." (*Id.*) A few days later, an unknown inmate entered Uselman's cell and sexually assaulted him. (*Id.* ¶ 26.) Five minutes after this occurred, Uselman approached the front desk and told unknown correctional officers about the incident. (*Id.* ¶ 27.) The officers escorted Uselman to Pentland's office, where Uselman discussed the situation with Pentland. (*Id.*) Pentland assured Uselman that he would investigate but never discussed the incident with Uselman again. (*Id.*)

Another incident occurred on November 13, 2011. At that time, Uselman was walking to his cell when an unknown inmate punched Uselman in the back of the head. (*Id.* ¶ 30.) Uselman believes the offender was a member of a gang. (*Id.* ¶ 30.) Uselman reported the incident to unknown officers, who reported it to Pentland. (*Id.* ¶ 31.) Pentland told Uselman to do his best to "stay out of the line of fire" so that he would not incur harm. (*Id.*)

Uselman also complains about his cellmate. In December 2011, a second inmate was placed in Uselman's cell. (*Id.* ¶ 34.) The cellmate allegedly exposed his genital area to Uselman numerous times and, on December 12, 2011, punched Uselman repeatedly "near the pelvic area." (*Id.*) Uselman complained and was moved to a single cell. (*Id.*) He was placed on regular recreational status, meaning he spent recreation time with other offenders, and complains that he was not provided the option to spend that time alone. (*Id.*)

Uselman alleges that Pentland risked Uselman's life by placing him in the prison's general population and not permitting him to be segregated at all times. (*Id.* ¶ 36.) He names other inmates who threatened him, and alleges that some inmates wrote letters to unknown persons, instructing them to hurt Uselman. (*Id.* ¶ 35.) He claims that various gangs are extorting property from him and seek opportunities to be near him. (*Id.* ¶ 40.) Uselman also avers that unknown correctional officers destroy Uselman's legal mail whenever there is a cell search. (*Id.* ¶ 38.) Uselman asserts that he has written "two different grievances on the Defendant which was sent to him. Plaintiff has asked Defendant Pentland on both grievances, turned in at different times, to be secluded to protect Plaintiff from harm and the response was there is nothing he can do about it." (*Id.* ¶ 10.)

      **B.**      **Pentland's Submissions**

Pentland offers numerous affidavits regarding the allegations contained in Uselman's complaint. In his own affidavit, he explains that the majority of offenders at MCF-Rush City are housed in Complexes Two, Three, and Four. (Pentland Aff. ¶ 2.) Complex One houses offenders serving disciplinary segregation sentences (for offenders sentenced to a period of time after being convicted by MCF-Rush City's discipline unit), on administrative segregation status (used when an offender requires isolation for medical or safety reasons, is under investigation, or is

4

being held pending transfer), and on temporary housing status (for offenders assigned to the segregation unit due to non-availability of space in the general population). (*Id.* ¶¶ 2-3.) A small portion of Complex One is used to house general population offenders who are not assigned to programming. (*Id.* ¶ 2.)

An offender is placed on administrative segregation status for his protection if there is a verifiable threat to his safety. (*Id.* ¶ 3.) It is not sufficient that the offender says he has been threatened or is in fear. (*Id.*) Instead, he must provide the name of the threatening individual, specific information about the threat, and information for the threat to be substantiated. (*Id.*) Offenders serving disciplinary segregation sentences, or on administrative segregation status or temporary housing status, have fewer privileges than offenders in the general population. (*Id.* ¶ 4.) They spend twenty-three hours in their cells daily. (*Id.*) They receive one hour of recreation daily, with six or seven offenders recreating at the same time. (*Id.*) In some circumstances, offenders recreate alone. (*Id.*) Offenders on administrative segregation status generally recreate alone. (*Id.*)

Pentland highlights that, although Uselman claims Pentland failed to protect him from assaults in July, August, and September 2010 by failing to keep him in segregation, there are no incident reports documenting any assaults of Uselman during that time period, and Pentland knows of none. (*Id.* ¶ 8.) Pentland notes that there is an incident report from October 2010 when Uselman said some men wanted to "kick his butt." (*Id.* ¶ 10, Ex. D.) When asked by officers, Uselman said he did not know the offenders' names wanted to go to segregation. (*Id.*)

On December 21, 2010, Uselman was released on supervised release to MSOP, but was re-incarcerated in October 2011. (Hudson Aff. ¶ 3, Ex. C.) On November 10, 2011, he was transferred to MCF-Rush City. (*Id.* Ex. C-D.) As noted, Uselman alleges being punched in the

5

head on November 13, 2011, as he was returning from the dining hall. Pentland emphasizes that, during Uselman's second incarceration, Uselman did not enter Complex One until November 14, 2011. Therefore, Pentland could not have taken steps to prevent the alleged assault of November 13. (Pentland Aff. ¶ 11.)

In December 2011, Uselman informed staff that he had been bruised by his cellmate. Jeannette Wilson ("Wilson"), the Health Services Administrator for MCF-Rush City, submits an affidavit discussing this incident. She notes that, on December 12, 2011, Uselman reported that he had engaged in horseplay with a cellmate and requested to see a nurse. (Wilson Aff. ¶ 7, ECF No. 37; Pentland Aff. Ex. E.) The staff member called Health Services, noted Uselman had a bruise on his hip, and requested a nurse. (Wilson Aff. ¶ 7.) When the nurse arrived to evaluate the bruise, Uselman denied being assaulted, asserted that he "'had the right to refuse any and all medical treatments,'" and declined medical treatment. (*Id.* Ex. A; Pentland Aff. Ex. E.) The medical notes and Wilson's account are consistent with the incident report provided by Pentland on the topic.[1] (*See* Pentland Aff. Ex. E.) Officers photographed the bruising. (*Id.*) Both Uselman and the cellmate resumed recreating alone. (*Id.* ¶ 13.)

One month after the incident, on January 30, 2012, Uselman wrote a kite (intraprison correspondence) asserting he wanted to share a cell with his former cellmate (the one he alleged gave him the bruise). Uselman wrote that he felt safe with his former roommate because the roommate assisted with Uselman's stress and anger problems and kept him calm. (Pentland Aff. Ex. F.) Uselman further stated that there was "no reason whatsoever" to have moved Uselman

---

[1] Wilson also opines that if an offender had wounds as described by Uselman, such as bleeding stab wounds, lost consciousness, or significant bruising around the head consistent with beating, staff members would have noticed and would have arranged for an emergency response to evaluate those injuries. (Wilson Aff. ¶ 5.) Other than the bruise from horseplay, Uselman's file contains no documentation of injuries consistent with those alleged in this action. (*Id.* ¶ 6.)

from that roommate arrangement because "I was getting along with him and I have no problems with him." (*Id.*) Pentland denied the request upon the advice of Uselman's and the roommate's mental health providers. (Pentland Aff. ¶ 13.)

As stated, after the December 12, 2011, incident, Uselman spent the recreation period alone. Throughout January and February 2012, Uselman vacillated between wanting to recreate alone and wanting to recreate with others: he would inform Pentland that he wanted to spend his recreation time alone because he feared other inmates,[2] Pentland would grant the request, Uselman would then request to recreate with the other offenders, and so on. (*Id.* ¶ 15.) After this cycle occurred a few times, Pentland eventually did not remove Uselman from recreate-alone status because Uselman did not respond to Pentland's request asking Uselman to confirm he had made the request. Also informing Pentland's decision was Pentland's awareness that Uselman angered other offenders by yelling racial slurs, exposing himself, and engaging the emergency button for non-emergencies during other offenders' recreation time, thereby cutting their recreation short. (*Id.* ¶ 16.)

Pentland denies that Uselman ever told him that he was being extorted. (*Id.* ¶ 17.) He also denies ever ordering staff to destroy Uselman's legal materials. (*Id.* ¶ 18.) Pentland acknowledges that Uselman was often afraid of his fellow inmates. (*Id.* ¶¶ 12, 18.) However, he attests that Uselman was never in imminent danger of harm and denies that Uselman was harmed. (*Id.* ¶ 18.)

Gregory Smith ("Smith"), Associate Warden of Operations for MCF-Rush City, also submits an affidavit. Smith discusses Uselman's description of the July, August, and September

---

[2] Upon request, he would not provide information about the alleged threats received from his fellow inmates. (Pentland Aff. ¶ 16.)

2010 alleged attacks, as well as the November 13, 2011, alleged attack, and states the descriptions indicate the events occurred while Uselman was in the general population. (Smith Aff. ¶ 11, ECF No. 33.) The Complaint's alleged assaults of July and August 2010 occurred while Uselman was in the recreation yard, the alleged assault of November 13, 2011 occurred in the dining hall, and the September assault had occurred once Uselman had "returned to population." (Compl. ¶¶ 19-20, 26, 30.) Smith attests that no offender on disciplinary or administrative segregation status has access to the yard or dining hall. (Smith Aff. ¶ 11.) Therefore, Smith contends, Uselman's allegations regarding those dates refer to his time spent in general population. (*Id.*) With the exception of a brief period in June 2010, all of Uselman's time in general population occurred in units other than Complex One. (*Id.*)

Smith discusses the use of incident reports at MCF-Rush City. Staff members are required to write incident reports regarding any assaults, fights, and offender injuries. (*Id.* ¶ 12.) Other than an incident report regarding Uselman's December 2011 horseplay with his cellmate, there are no incident reports regarding the assaults alleged in Uselman's complaint. (*Id.*) Smith also has no recollection of being informed of these incidents. (*Id.* ¶ 13.) He continues by noting that staff members perform scheduled counts throughout the day, and that staff evaluate offender welfare during these times. (*Id.*) If there were injuries such as those described by Uselman, Smith avers, staff would have noticed, arranged for medical care, and documented the injuries in an incident report. (*Id.*)

Smith also details the process used following an allegation of sexual assault. He asserts that the "DOC uses a complex procedure to investigate allegations of sexual assault" and that staff are required to take immediate, documented action because such allegations could lead to criminal charges. (*Id.* ¶ 15.) Smith reviewed MCF-Rush City records and found no record of a

sexual assault as alleged by Uselman here. (*Id.* ¶ 16.) He noted an incident report from July 15, 2010, when Uselman reported that a roommate (not discussed by Uselman in the present action) proposed various sexual activities. (*Id.* Ex. H.) Uselman declined to engage in the proposed activities. (*Id.*) When questioned by officers, Uselman said "[nothing] physical had happened." (*Id.*) Smith placed Uselman on administrative segregation status pending review, and the roommate was placed under investigation. (*Id.*) The roommate was not charged with any disciplinary violation based on the incident. (*Id.* ¶ 16.)

Finally, Smith reveals that MCF-Rush City performs an incompatibility review if verifiable information is received indicating that one offender poses a threat to another offender's safety. (*Id.* ¶ 8.) Uselman had no assigned incompatibilities while at MCF-Rush City. (*Id.* ¶ 9.)

## II.     Standard of Review

Pentland's motion seeks to serve as both a motion to dismiss and a motion for summary judgment. As provided fully below, the Court considers the issue of administrative exhaustion, which is considered through summary judgment. Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Chial v. Sprint/United Mgmt. Co.*, 569 F.3d 850, 853-54 (8th Cir. 2009) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)). The moving party bears the burden to show that the material facts are not in dispute. *Mems v. City of St. Paul*, 224 F.3d 735, 738 (8th Cir. 2000). The nonmoving party may not respond with mere allegations or denials but must present specific facts creating an authentic issue for trial. *Anderson*, 477 U.S. at 248,

256. The evidence and resulting inferences are viewed in the light most favorable to the nonmoving party. *Graves v. Ark. Dep't of Fin. & Admin.*, 229 F.3d 721, 723 (8th Cir. 2000).

**III.   Discussion**

The lawsuit is against Pentland in both his official and individual capacities. (Compl. ¶ 4.) Uselman requests various forms of relief for the alleged wrongdoing. This relief includes monetary damages in categories labeled compensatory, punitive, physical, emotional, psychological, mental, and actual. (*Id.* ¶¶ 49-55.) He also seeks a declaration that his rights have been violated, costs of this action, exemption for certain funds, and a request regarding the mail in his cell. (*Id.* ¶¶ 48, 59-60.) Finally, he asks the Court to order him to serve the remainder of his confinement at MSOP. (*Id.* ¶ 61.)

Pentland moves for summary judgment because Uselman failed to exhaust administrative remedies. He also moves to dismiss Uselman's official capacity damages claims as barred by the Eleventh Amendment, and for summary judgment because he did not violate Uselman's constitutional or statutory rights and because he is entitled to qualified immunity. Finally, Pentland claims that Uselman has failed to state a claim upon which relief can be granted for some of his contentions. (Def.'s Mem. 12, 14, 16, 25, July 15, 2013, ECF No. 31.)

The Court finds that it is unnecessary to address Pentland's various substantive arguments because, for the reasons articulated below, Uselman unquestionably has failed to exhaust his administrative remedies as required by the Prisoner Litigation Reform Act (PLRA), and his suit must be dismissed on that basis. *See Wolf v. Johnson*, Civ. No. 08-818 (JSM/PJS), 2009 WL 585971, at *4 (D. Minn. Mar. 6, 2009) (declining to analyze alternative arguments for dismissal after dismissing federal prisoner's action on the basis of failing to exhaust administrative remedies).

A.     **Exhaustion of Remedies**

Pentland argues that Uselman has not exhausted his administrative remedies with respect to the claims pleaded in the Complaint. The PLRA provides, in relevant part, "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes," *Porter v. Nussle*, 534 U.S. 516, 524, 532 (2002), and regardless of the nature of the claim or the relief the prisoner is seeking, *see Booth v. Churner*, 532 U.S. 731, 741 (2001).

Failure to exhaust administrative remedies results in the dismissal of an unexhausted claim. 42 U.S.C. § 1997e(c)(1). If it is established that exhaustion of administrative remedies did not occur prior to filing of the suit, both the Supreme Court and Eighth Circuit have made it clear that dismissal is mandatory. *Jones v. Bock*, 549 U.S. 199, 211 (2007) ("[t]here is no question that exhaustion [of administrative remedies] is mandatory under the PLRA and that unexhausted claims cannot be brought in court"); *Woodford v. Ngo*, 548 U.S. 81, 85 (2006) ("[e]xhaustion is no longer left to the discretion of the district court, but is mandatory"); *Johnson v. Jones*, 340 F.3d 624, 627-28 (8th Cir. 2003) (finding that if a prisoner does not exhaust his administrative remedies before filing a complaint in federal court, "dismissal is mandatory," and even if a prisoner subsequently satisfies the exhaustion requirement while his action is still pending, the case still must be dismissed). The Supreme Court has identified the benefits of exhaustion to include "allowing a prison to address complaints about the program it administers before being

subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation . . . by leading to the preparation of a useful record." *Jones*, 549 U.S. at 219.

In support of his exhaustion contention, Pentland provided copies of the DOC's grievance procedure, and described the procedure Uselman needs to follow. (Ebeling Aff. ¶ 2, Ex. A, ECF No. 34.) An inmate "must attempt to resolve any concerns informally via the kite system prior to pursuing the formal grievance process." (*Id.* Ex. A ¶ A.) The grievance procedure includes definitions, how to initiate a formal grievance, how the formal grievance is processed, exceptions to filing at the facility, information regarding the appeal process, and language regarding accommodations. (*Id.* Exs. A.) The DOC's formal grievance procedure has two levels. (*Id.* ¶ 3). First, an inmate must file a grievance with the correctional facility's grievance coordinator, and either the warden of the facility, or a designee, will decide the grievance. (*Id.*) The grievance must be filed within forty-five calendar days of the occurrence of the issue being grieved.[3] (*Id.* Ex. A.) Labeling a kite a grievance does not convert a kite into a formal grievance. (*Id.* ¶ 3.) If the inmate is dissatisfied with the facility's decision on his grievance, he may initiate a grievance appeal, which will be decided by the Commissioner of Corrections, the Assistant Commissioner, or the Deputy Commissioner. (*Id.*) The decision on appeal is considered the DOC's final response. (*Id.*) In the event the inmate fears retaliation at the facility where he is incarcerated, a grievance may be filed directly with the DOC's Central Office. (*Id.* ¶ 4.)

Kim Ebeling ("Ebeling"), an Administrative Specialist Senior with the Policy and Legal Services Division of the DOC, is involved in the coordination of grievance appeals within the DOC. (*Id.* ¶ 1.) According to Ebeling, the DOC grievance procedure may be used to address

---

[3] Before September 18, 2012, the deadline to file was thirty days from the occurrence of the issue being grieved. (Ebeling Aff. ¶ 3, Ex. A.)

nearly any issue or grievance that concerns the conditions of confinement at a particular facility. (*Id.* ¶ 2.) Ebeling identifies Uselman's claims of harm, extortion, and destruction of his legal mail and highlights that these claims are appropriate subjects for a grievance. (*Id.* ¶ 4.) Ebeling's review of the DOC grievance records revealed that Uselman has not filed any grievances or grievance appeals with Central Office on any topic. (*Id.* ¶ 4.)

Ebeling's statements are confirmed by Heather Sletten ("Sletten"), the MCF-Rush City grievance coordinator. (Sletten Aff. ¶ 1, June 19, 2013, ECF No. 35.) Sletten attests that, when an offender transfers to MCF-Rush City, he receives an offender handbook, which discusses the grievance policy. (*Id.* ¶ 2.) An offender may also request copies of the grievance policy. (*Id.*) She avers that the issues raised in Uselman's Complaint could have been raised in the grievance process. (*Id.* ¶ 3.) MCF-Rush City maintains records of grievances submitted by offenders, and Sletten reviewed the records. (*Id.* ¶ 5.) She found that Uselman had submitted two grievances during his time at MCF-Rush City, and neither related to the claims asserted in this action. (*Id.*) One related to Uselman's attempt to obtain his property from MSOP, and the other related to a dispute regarding health care. (*Id.*) These grievances did not discuss safety, Pentland's handling of safety concerns, or confiscation of legal materials. (*Id.*)

Uselman has submitted no evidence that creates a genuine issue of material fact concerning his failure to exhaust his administrative remedies. He filed no grievances or grievance appeals with the Central Office and only two grievances with MCF-Rush City, neither of which related to the present claims. *See Butala v. Gerlicher*, 13-CV-0633, 2014 WL 241865, at *6 (D. Minn. Jan. 22, 2014) (Schiltz, J.) (discussing the content of grievances and the importance of a prison being provided an opportunity to address complaints). He has failed to dispute Pentland's evidence, which establishes that Uselman failed to exhaust his administrative

remedies for his claims under § 1983. The DOC's grievance procedure is not fully exhausted until a prisoner follows all of the required steps and obtains a final decision. The evidence demonstrates that Uselman has failed to initiate that process, let alone complete it. Consequently, the Court recommends dismissal of Uselman's claims.[4]

### B. Type of Dismissal

Having determined that Uselman has not exhausted all available administrative remedies, this action must be dismissed. The only remaining issue for the Court to determine is whether the action will be dismissed with or without prejudice. Although a claim must be dismissed without prejudice when a prisoner fails to exhaust a claim, *Davis v. Harmon*, 389 Fed. Appx. 587, 587–88 (8th Cir. 2010) (per curiam), Uselman is no longer a "prisoner," *see Perkins v. Hedricks*, 340 F.3d 582, 583 (8th Cir. 2010) (concluding that a person who is civilly committed is not a prisoner). Dismissal of claims with prejudice is appropriate if, for example, a plaintiff can no longer exhaust his claims because "he has procedurally defaulted on them and his suit is precluded forever." *Parks v. Dooley*, Civ. No. 09-3514, 2011 WL 847011, at *17-18 (D. Minn. Feb. 11, 2011) (citing *Woodford*, 548 U.S. at 92-93 (requiring "proper exhaustion" under the PLRA)); *Wolf*, 2009 WL 585971, at *9 (dismissing with prejudice action filed by prisoner who had been released at time of order). Because the time limit during which Uselman may pursue his administrative grievances has lapsed, the Court further recommends dismissal with prejudice. *Berry v. Kerik*, 366 F.3d 85, 88 (2nd Cir. 2004) ("failure to pursue administrative remedies while they were available precluded [the plaintiff's] federal lawsuits, and they were properly dismissed with prejudice"). Dismissal without prejudice would serve no purpose because the incident about

---

[4] The Court notes that, even if it were to consider the substance of Uselman's arguments, some of his requests for relief, such as the request regarding the DOC's allowance of mail in his cell and the request to be transferred to MSOP, would be moot because he is now at MSOP.

which Uselman complains is time-barred by the DOC's grievance procedure.

## IV.     Recommendation

Based upon all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.     Defendant's Motion to Dismiss and for Summary Judgment (ECF No. 30) be **GRANTED**;

2.     This case be **DISMISSED WITH PREJUDICE**; and

3.     **JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: January 30, 2014                                  s/ *Jeanne J. Graham*

                                                         JEANNE J. GRAHAM
                                                         United States Magistrate Judge

### NOTICE

Pursuant to District of Minnesota Local Rule 72.2(b), any party may object to this Report and Recommendation by filing and serving specific, written objections by **February 14, 2014**. A party may respond to the objections within fourteen days after service thereof. Any objections or responses shall not exceed 3,500 words. The District Judge will make a de novo determination of those portions of the Report and Recommendation to which objection is made.